UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                          CRIMINAL ACTION NO. 2:11-00178

STEPHEN HOPKINS and
EDDIE DAIVON MORGAN

## MEMORANDUM OPINION AND ORDER

Pending are the separate motions to suppress of defendants Stephen Hopkins and Eddie Daivon Morgan, filed November 20, 2012.

On December 3, 2012, the court held an evidentiary hearing attended by counsel for the parties and the defendants. The court now enters its findings of fact and conclusions of law.

I.

At 9:14 p.m. on March 16, 2011, Charleston Police Department Officer Daniel C. Goffreda responded to a possible burglary in progress at 2603 Sixth Avenue on the West Side of Charleston.  Officer Goffreda arrived on the scene at 9:16 p.m. He extinguished his lights, exited the cruiser, and began approaching the subject residence.

While on foot looking for the residence, Officer Goffreda saw a silver Dodge Charger. Officer Goffreda's cruiser was parked approximately two car lengths away from the Dodge Charger but not blocking its exit. The Dodge Charger's engine was running, and the vehicle was parked in front of the lot upon which the subject residence sat. When Officer Goffreda noticed the two occupants in the vehicle, he approached the driver's side to speak with them. He did so for officer safety reasons in view of the reported burglary in progress.

One individual was in the driver's seat, Mr. Hopkins, and another individual, Mr. Morgan, was seated directly behind him. That configuration struck Officer Goffreda as "questionable."[1] (Trans. of Hrg. at 18). He explained his concern that the vacant front seat might have been occupied by "another person somewhere in the house or behind me or just walking around somewhere." (Id. at 24).

---

[1] On cross examination, Officer Goffreda explained his belief that there was "criminal activity afoot:"

> Well . . . this is . . . an officer safety thing. I'm going to a burglary in progress. Here is a car with a driver, there's someone in the back, there's no passenger. I don't want to just -- immediately just dismiss it, you know, and turn my back and then get shot.

(Id. at 19).

Officer Goffreda asked the individuals if they lived at the subject residence or knew who resided there. Mr. Morgan responded in the negative. Officer Goffreda did not have his sidearm drawn and was alone. He spoke in a conversational tone. Officer Goffreda told the vehicle occupants that he was investigating a burglary in progress.

Officer Goffreda then asked the driver for identification, though he may have phrased it as license. Mr. Hopkins provided an Ohio nondriver's document for a Tyrone Kimbrough. The photograph appeared to match Mr. Hopkins. Mr. Hopkins' use of a nondriver's identification, however, left Officer Goffreda with the impression that the driver was not lawfully operating the vehicle and, accordingly, possibly guilty of a traffic offense. Officer Goffreda held on to the identification card during the conversation.

When Officer Goffreda asked Mr. Hopkins and Mr. Morgan why they were in the area, Mr. Hopkins responded that they were "girl watching."[2] (Trans. at 6). The response further aroused

---

[2] Mr. Hopkins testified that he stated only that they were "waiting on some girls." (Id. at 91). He testified that he had picked up the women at their apartment and dropped them off on Sixth Avenue. He could not recall where their apartment was located nor where they went after he dropped them off and waited on them.
(continued)

Officer Goffreda's suspicion inasmuch as they were in a residential area at night after 9:00 p.m., no pedestrians were in the area, and it was quiet. Around that time, three detectives from the Street Crimes Unit, Whittington, Burton, and Crowder, arrived in plainclothes and an unmarked vehicle. They parked three car lengths away from the Dodge Charger, just beyond Officer Goffreda's cruiser. Neither vehicle blocked the Dodge Charger from leaving the scene.

Officer Goffreda asked Mr. Hopkins to turn off the car engine. Mr. Hopkins did so. As the detectives walked to the vehicle, Officer Goffreda then asked Mr. Morgan and Mr. Hopkins to get out.[3] Detective Whittington had by that time reached the driver's side window area of the Dodge Charger and listened to the conversation between Officer Goffreda and Mr. Hopkins. Detective Crowder was on the driver's side as well, with Detective Burton approaching the passenger side window. In response to Officer Goffreda's request that the defendants exit the vehicle, Mr. Hopkins "kind of said something to the effect of like, 'Huh, what?' and he leaned back, and as he was doing

---

Mr. Hopkins could not, inter alia, recall their names, the time he had spent with them that day, when they were supposed to return to his vehicle, or how long he had been waiting for them.

[3] Mr. Hopkins testified that he was told to exit the vehicle and place his hands behind his back. He admits he was advised that he was not being placed under arrest.

4

it, . . . [Officer Goffreda] noticed he was turning the car back on." (Trans. at 7). He did so "in kind of one motion," objectively indicative of one wishing to make a rapid departure. (Id.)

When Mr. Hopkins restarted his engine, Detective Whittington also told him to step out of the car and attempted to reach inside and disable the vehicle as Mr. Hopkins reached for the shifter. Detective Whittington deemed Mr. Hopkins to be attempting to flee.

Mr. Hopkins put the car in drive and sped off heading west on Sixth Avenue. He left his identification card in Officer Goffreda's possession. From a timing perspective, Officer Goffreda's discussion with Mr. Hopkins and Mr. Morgan lasted approximately two minutes. Less than one minute elapsed from the time the detectives arrived until the chase began.

Officer Goffreda ran back to his cruiser and attempted pursuit, which continued east on Seventh Avenue. An Officer Rogers, who was earlier dispatched to the scene but had not yet arrived, joined the chase in progress, along with other law enforcement officers including the detectives. Officer Rogers took the lead inasmuch as Officer Goffreda "was pretty far

behind."  (Id.).  The Dodge Charger reached a speed of at least 60 miles per hour in its attempt to flee.[4]

Not long after the chase began, the Dodge Charger attempted to turn south on Iowa Street.  The vehicle crashed into a tree when Mr. Hopkins lost control.  The occupants then ran in opposite directions.  Detectives Whittington and Burton pursued Mr. Morgan on foot for approximately 80 yards as he fled between two houses.  When Mr. Morgan reached, and attempted to climb, a chain-link fence, he was instructed to get on the ground.  He complied.  All three of them then returned to the crash scene.

Officers Goffreda and Rogers initially chased Mr. Hopkins in their vehicles as he ran on Seventh Avenue.  They switched to a foot pursuit, however, when Mr. Hopkins turned to run between houses in the residential area.  When he attempted to climb a fence, Officer Rogers instructed him to stop.  When Mr. Hopkins disobeyed the command, he was demobilized by a Taser™.  Mr. Hopkins pockets were searched and a large sum of

---

[4] Officer Goffreda estimated the speed based upon the fact his pursuing vehicle was traveling at a rate of 70 to 80 miles per hour.  He was gaining on the Dodge Charger, but not quickly. The posted limit on the roads where the chase occurred range from 25 to 40 miles per hour.

United States currency was recovered.  The three of them then
returned to the crash scene.

In their absence, Corporal Peter S. Kapeluck of the
Charleston Police Department had arrived on the scene at 9:21
p.m.  He was tasked with completing the crash investigation.
Officer Kapeluck was aware that the accident had occurred
following a law enforcement chase.  He concluded that the
vehicle was not operational and would require a tow.  The
driver's door to the abandoned vehicle was left open and the key
was in the ignition.  Consistent with standard policy, he
conducted an inventory search and found a grocery-style plastic
bag filled with eleven folds of United States currency,
marijuana, and a substance characteristic of heroin.  When
Detective Whittington returned to the crash scene with Mr.
Morgan, Officer Kapeluck handed him the plastic bag which
Detective Whittington opened up to see its contents.  Two mobile
phones were also recovered during the inventory, along with a
gun holster.[5]

---

[5] It is worth noting, however, that Officer Kapeluck aptly
observed  the necessity of inventory searches.  They serve to
protect law enforcement and towing personnel from false claims
for damage or theft, along with securing the vehicle owner's
property.  That testimony is consistent with the Charleston
Police Department's vehicle inventory regulations, which are
attached to a December 7, 2012, letter to the court from Mr.
Hopkins' counsel, which is ordered filed today.
(continued)

Officer Kapeluck transferred these fruits of the inventory search to Detective Whittington at the scene.[6] Detective Whittington powered up the phones and first accessed the one belonging to Mr. Morgan. He scrolled through all of the photographs and noticed nothing incriminating. When he did likewise to Mr. Hopkins' phone, he saw one photo of Mr. Hopkins holding folds of money up to his face while smiling. The money he held "was pretty close to the amount of . . . currency folds

_____

The vehicle inventory regulations permit an inventory and impoundment, inter alia, when "[a] vehicle has been . . . used in the commission of a crime (as evidence)." (Reg. § 14.10). As is apparent from the factual findings, Mr. Hopkins appears to have used the vehicle in the course of committing a number of offenses, including speeding, fleeing, reckless driving, and leaving the scene of an accident. See W. Va. Code §§ 17C-6-1(e), 61-5-17(e), 17C-5-3(c), 17C-4-2.

Counsel suggests the motivation for the search, as reflected on a 911 recording, was to further investigate the presence of the holster. The court notes that one of the justifications for the inventory policy is to "protect[] . . . the Department/Public from potential danger . . . ." (Reg. § 14.10). According to the inventory policy, such searches are additionally justified by the necessity of (1) securing the owner's property while it is in law enforcement custody, and (2) protecting law enforcement from claims of lost or stolen property. The inventory search was proper.

[6] Detective Whittington remembered the matter differently. He testified that he seized Mr. Morgan's mobile phone during a search of his person incident to his arrest. Detective Whittington further testified that Mr. Hopkins' mobile phone would have been recovered in the same manner by "[w]hoever placed Mr. Hopkins in custody." (Trans. at 51). The court finds that the sequencing of the events, and the specificity of Officer Kapeluck's narrative concerning the location and chain of custody of the phones, warrants a finding that Detective Whittington's version should yield.

that was in the grocery bag that was located inside the car."
(Id. at 57).  Another photo depicted a coffee table holding
large amounts of United States currency.  A search warrant was
ultimately obtained for both mobile phones, at which time their
photographic contents were accessed again and printed.

On November 29, 2011, the federal grand jury which had
returned an indictment against them on August 2, 2011, returned
a superseding indictment charging Mr. Hopkins and Mr. Morgan
with aiding and abetting the possession with intent to
distribute a quantity of heroin, in violation of 21 U.S.C. §
841(a)(1) and 2.  Following their initial appearances and
arraignments in federal court on October 11, 2012, on November
20, 2012, Mr. Morgan moved to suppress.  He asserts that the
March 16, 2011, law enforcement search of his vehicle was
unlawful and that the contraband recovered should be excluded
from the evidence in the case.  Specifically, Mr. Morgan asserts
three suppression arguments.  First, he contends that he was the
subject of a Terry stop at the outset of his encounter with
Officer Goffreda that was unsupported by reasonable suspicion.

Second, he claims that any evidence subsequently
seized must be excluded as fruit of the illegal stop.  Third, he
asserts that the warrant issued to search his mobile phone was
unsupported by probable cause.  In support of the final

contention, he contends that (1) he was merely present in the subject vehicle, and (2) the search warrant affidavit incorrectly represented that images on the phone depicted him in possession of large quantities of cash.

As noted, Mr. Hopkins also moves to suppress the contraband evidence seized in the case. He offers the same arguments in support as Mr. Morgan, with the exception that he omits the final argument respecting the sufficiency of the search warrant affidavit for his mobile phone.

II.

A.    Governing Fourth Amendment Standards

The Fourth Amendment protects the citizenry "against unreasonable searches and seizures." U.S. Const. amend. IV. At the same time, "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. 405, 408 (2005) (quoting in part United States v. Jacobsen, 466 U.S. 109, 123 (1984)). So it is critical to first properly characterize any police-citizen encounter in order to ascertain if the Fourth Amendment threshold has been crossed. Our court of appeals has

observed as follows:

> The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification.

United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002) (citations omitted).

Respecting arrest, the probable cause standard is "an objective one; it exists when, at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." United States v. Johnson, 599 F.3d 339, 346 (4th Cir. 2010)(citation and internal quotation marks omitted); Gerstein v. Pugh, 420 U.S. 103, 111 (1975). The existence of probable cause "always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992).

Respecting investigatory stops, law enforcement may detain a person for brief inquiry when supported by reasonable suspicion arising from articulable facts indicative of criminal misconduct. Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000);

Terry v. Ohio, 392 U.S. 1, 30 (1968).  Reasonable suspicion
depends upon the totality of the circumstances, including what
the officer knows and any reasonable inferences that might be
drawn when the stop occurs.  United States v. Sokolow, 490 U.S.
1, 8 (1989); United States v. Black, 525 F.3d 359, 364-65 (4th
Cir. 2008).  Importantly, reasonable suspicion may exist despite
the fact that "each individual factor 'alone is susceptible of
innocent explanation.'"  Black, 525 F.3d at 365 (quoting United
States v. Arvizu, 534 U.S. 266, 277 (2002)).  In particular,
evasive behavior and alarmed reaction support a reasonable
suspicion of criminal activity.  United States v. Smith, 396
F.3d 579, 584 (4th Cir. 2005); United States v. Humphries, 372
F.3d 653, 657 (4th Cir. 2004); United States v. Lender, 985 F.2d
151, 154 (4th Cir. 1993).

         At the lowest rung of the Fourth Amendment hierarchy
is the third category, namely, those "voluntary citizen-police
encounters [that] do not implicate the Fourth Amendment" at all.
Black, 525 F.3d at 364.  As indicated by its text, the Fourth
Amendment is concerned with unreasonable searches and seizures
of citizens.  A seizure, however, "does not occur simply because
a police officer approaches an individual and asks a few
questions."  Florida v. Bostick, 501 U.S. 429, 434 (1991).
Absent a seizure, a police-citizen encounter is considered

consensual and "will not trigger Fourth Amendment scrutiny." Id.
at 439; United States v. Farrior, 535 F.3d 210, 218 (4th Cir.
2008)("Under Bostick, the question is whether a reasonable
person would have felt free to decline the officer's request or
otherwise terminate the encounter."). Additionally, in both
United States v. Drayton, 536 U.S. 194, 204 (2002), and Florida
v. Rodriguez, 469 U.S. 1, 5-6 (1984), the Supreme Court observed
that a seizure did not occur simply because law enforcement
approached an individual, displayed their badges, and started
asking questions.

It is also important to note that the court is not
bound by the officers' subjective understandings of where a
particular encounter might fall on the Fourth Amendment
spectrum. The analysis is entirely objective. As the Supreme
Court reiterated recently:

> "Our cases have repeatedly rejected" a subjective
> approach, asking only whether "the circumstances,
> viewed objectively, justify the action." Indeed, we
> have never held, outside limited contexts such as an
> "inventory search or administrative inspection . . .,
> that an officer's motive invalidates objectively
> justifiable behavior under the Fourth Amendment."

Kentucky v. King, 131 S. Ct. 1849, 1859 (2011) (citations
omitted).

## B.  Analysis

It was permissible for Officer Goffreda to approach the Dodge Charger and speak with Mr. Hopkins and Mr. Morgan. His initial conversation with them, ranging from whether they lived in the subject residence up to the point of requesting identification all fell within the parameters of a routine police-citizen encounter that required no objective justification.  Mr. Hopkins and Mr. Morgan were free to leave.

The defendants suggest that Officer Goffreda's request that they step out of the Dodge Charger constituted a seizure lacking either probable cause or reasonable suspicion.  The law is otherwise, as observed by the Supreme Court in <u>California v. Hodari D.</u>, 499 U.S. 621, 624 (1991), and our court of appeals in <u>United States v. Letsinger</u>, 93 F.3d 140 (4th Cir. 1996), a case in which the following analysis is found:

> In <u>Hodari D.</u>, in addressing whether a suspect fleeing from police was " 'seized' within the meaning of the Fourth Amendment" by virtue of the police pursuit, the Supreme Court identified two circumstances in which a person can be "seized" even though he is not actually brought under physical control. First, the Court concluded that a person is "seized" if he is touched by a police officer with lawful authority and purpose to arrest, even if that person is not subdued. In so concluding, the Court recognized, and indeed to some extent created, an exception to the general common law requiring the actual " 'taking [of] possession,' " . . . . Second, . . . the Court also concluded that a person

is "seized" under the Fourth Amendment upon the
submission of that person to an official "show of
authority." Focusing on this latter circumstance of
seizure, and assuming arguendo that the police pursuit
at issue there constituted a "show of authority," the
Court held that, "since Hodari did not comply" with
that "show of authority," he was not seized "until he
was tackled," that is, until he was physically touched
. . . .

Letsinger 93 F.3d at 143, 144-145 (4th Cir. 1996) (stating also

"[T]he suspect must submit to that show of authority in order

for there to be a 'seizure' . . . . Just as 'yelling "Stop in

the name of the law!" at a fleeing form that continues to flee'

is 'no seizure,' so also yelling 'I seize your suitcase!' at a

suspect who does not relinquish control is 'no seizure.' It was

not at common law, and we perceive no reason why it should be

today.")(citations omitted); see, e.g., also United States v.

Watson, No. 11-4371, 2013 WL 14548, at *3 (4th Cir. Jan. 2,

2013)("As a general rule, a seizure requires either the use of

physical force or, absent the use of such force, a submission to

an officer's assertion of authority."); United States v. Brown,

401 F.3d 588, 594 (4th Cir. 2005)("A defendant who flees the

police in response to an assertion of authority has not been

seized, and thus his Fourth Amendment rights are not

implicated."); United States v. Smith, 396 F.3d 579, 587 n.5

(4th Cir. 2005) ("The Supreme Court has held that a suspect is

not seized within the meaning of the Fourth Amendment until

officers apply physical force or the suspect submits to a show

of authority. When an officer asserts his authority but the suspect does not yield to that authority, there is no seizure.")(citation omitted); United States v. Scheetz, 293 F.3d 175, 183 (4th Cir. 2002) (no seizure where the defendant executed an illegal U-turn to avoid a police checkpoint); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) (noting that a law enforcement "show of authority in calling for the defendant to stop is not a seizure when the defendant does not yield to that authority").

From an objective standpoint, however, the categorization of the encounter changed rapidly in the seconds that followed. First, it must be remembered that Officer Goffreda was responding to a reported burglary in progress. Second, he saw a vehicle with a somewhat unusual passenger configuration sitting in front of the parcel upon which the subject residence sat, with the engine running. Third, it seems customary that the driver of a vehicle would provide his operator's license to a law enforcement officer requesting identification. Mr. Hopkins instead provided a nondriver's identification. Fourth, when asked about why they were in the area Mr. Hopkins evasively responded that they were "girl watching" in what was a relatively secluded residential area of Charleston, at night, with no "girls" or anyone else in sight.

Fifth, when asked to exit the vehicle, Mr. Hopkins instead engaged it and fled.

The Supreme Court has articulated factors to be weighed in considering the totality of the circumstances that might support the reasonable suspicion necessary to justify a Terry stop.  These factors include: (1) whether a high crime area is involved, Adams v. Williams, 407 U.S. 143, 147 (1972), (2) whether an individual exhibits evasive behavior, United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975), and (3) whether there is unprovoked flight, Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) ("Headlong flight -- wherever it occurs -- is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

Mr. Hopkins' unaccounted presence in the vicinity of a reported burglary in progress, coupled with his evasive behavior and the inference that, in providing the officers with a nondriver identification, he was without authority to operate the vehicle, together with his attempt to flee, caused a routine encounter with police to ripen into one that gave rise to the reasonable suspicion necessary for a Terry stop.  Once that occurred, law enforcement was entirely justified in attempting to stop the Dodge Charger from leaving the scene and then to

give chase and apprehend the suspects.  <u>See</u>, <u>e.g.</u>, <u>United States</u>
<u>v. Haye</u>, 825 F.2d 32, 35 (4th Cir. 1987)("By its very nature . .
. a <u>Terry</u> stop is involuntary, and the suspect is not free to
avoid it by flight.  To that extent, his freedom is limited, and
the policeman is authorized to use such reasonable force as may
be necessary to accomplish the purpose of the limited stop.").

        Mr. Hopkins and Mr. Morgan additionally challenge the
search of their mobile phones.  It does not appear, however,
that they have a lawful basis for challenging that examination.
Mr. Hopkins and Mr. Morgan were driving in a rental vehicle that
was leased by another individual.  Mr. Hopkins identified the
lessor as "Ashley."  He did not know her surname.  Ashley
entrusted the car to Mr. Hopkins that very day.

        It is unsurprising that, after being pursued by law
enforcement and crashing the vehicle, Mr. Hopkins and Mr. Morgan
might hurriedly, and voluntarily, leave the car and its contents
behind.  Their decision to forsake the vehicle and their
personal property, however, may have resulted in unintended
Fourth Amendment consequences:

    We recently stated in <u>United States v. Leshuk</u> that

                a person who voluntarily abandons property
                loses any reasonable expectation of privacy
                in the property and is consequently

                              18

> precluded from seeking to suppress evidence
> seized from the property.

65 F.3d 1105, 1111 (4th Cir. 1995).

United States v. Han, 74 F.3d 537, 543 (4th Cir. 1996); 1 Joseph G. Cook, Constitutional Rights of the Accused § 4:6 (3rd ed. elec. 2010) ("Property which has been . . . abandoned harbors no privacy interest of its former holder, and therefore its seizure does not give rise to a Fourth Amendment claim.").

Abandonment depends "'not [on] whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the [property] alleged to be abandoned.'" United States v. Stevenson, 396 F.3d 538, 546 (4th Cir. 2005) (quoting United States v. Haynie, 637 F.2d 227, 237 (4th Cir. 1980)) (second alteration in original).

As noted, Mr. Hopkins and Mr. Morgan seriously damaged a vehicle in which they had no ownership interest after it collided with a tree at high speed during a chase by law enforcement. In their haste to leave the scene and further evade the law enforcement pursuit, they left the driver's door open with the key in the ignition, deserting the vehicle and its contents. Additionally, there is no indication that either of them inquired about the location of the mobile phones following

their arrests.  The same is true of the remaining vehicle
contents.

Based upon these undisputed facts, the court concludes
that neither Mr. Hopkins nor Mr. Morgan retained a reasonable
expectation of privacy in the vehicle or its contents.
Consequently, the Dodge Charger, the mobile phones, and the
other items in the vehicle were voluntarily abandoned, and the
defendants are precluded under Leshuk from seeking to suppress
the evidence seized from the automobile.[7]

---

[7]  Noteworthy as well is our court of appeals' decision in
United States v. Murphy, 552 F.3d 405 (4th Cir. 2009), which
addressed a situation where law enforcement examined the
contents of a mobile phone at the station following the
accused's arrest, and without first obtaining a warrant to do
so.  Similar to the circumstances in Murphy, the mobile phones
here were seized lawfully, either incident to an arrest or
during an inventory, and then examined further by law
enforcement later.  As noted in Murphy:

> Another search of the cell phone occurred at the
> Sheriff's Department during the course of the
> inventory search, when a supervising officer noted
> that the cell phone contained potentially
> incriminating information and directed Trooper Pruett
> to retain the cell phone as evidence in the case. Of
> course, once the cell phone was held for evidence,
> other officers and investigators were entitled to
> conduct a further review of its contents, as Agent
> Snedeker did [over three weeks later], without seeking
> a warrant.

Id. at 412 (citing United States v. Edwards, 415 U.S. 800, 803-
04 (1974); see Edwards, 415 U.S. at 806 ("Indeed, it is
difficult to perceive what is unreasonable about the police's
examining and holding as evidence those personal effects of the
(continued)

Based upon the foregoing discussion, it is ORDERED that the defendants' motions to suppress be, and they hereby are, denied.

The Clerk is directed to transmit a copy of this written opinion and order to the defendants and all counsel of record.

ENTER:  January 9, 2013

John T. Copenhaver, Jr.
United States District Judge

---

accused that they already have in their lawful custody as the result of a lawful arrest.").  Such a search is often justified for other reasons based upon the possibly evanescent nature of mobile phone data.  Cf. United States v. Flores-Lopez, 670 F.3d 803, 808 (7th Cir. 2012) ("Other conspirators were involved in the distribution of methamphetamine besides . . . the defendant, and conceivably could have learned of the arrests . . . and wiped the cell phones remotely before the government could obtain and execute a warrant and conduct a search pursuant to it.").  The search of the mobile phones at the station was thus entirely permissible.